IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RICHARD CARDONA, | ) | No. C 08-5429 CRB (PR) |
| Petitioner, | ) | |
| vs. | ) | ORDER GRANTING PETITION FOR A WRIT OF HABEAS CORPUS |
| BEN CURRY, Warden, | ) | |
| Respondent. | ) | |

      Pro se Petitioner Richard Cardona, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging the California Board of Prison Hearings' ("BPH") July 25, 2006 decision to deny him parole at his eighth parole suitability hearing. Doc. #1; see Doc. # 9-8 at 8. At the time he was denied parole in 2006, Petitioner had served approximately twenty-one years on his fifteen-to-life sentence, almost twelve years past his minimum eligible parole date of November 6, 1994. Doc. #1 at 23.

      On April 7, 2009, the Court issued an Order to Show Cause why the writ should not be granted. Doc. #6. Respondent filed an Answer to the Order to Show Cause and Petitioner filed a Traverse. Doc. ## 9 & 11.

After the matter was submitted, on April 22, 2010, the Ninth Circuit issued its decision in <u>Hayward v. Marshall</u>, 603 F.3d 546 (9th Cir. 2010) (en banc), which addressed important issues relating to federal habeas review of BPH decisions denying parole to California state prisoners. On May 4, 2010, the Court ordered the parties to file supplemental briefing explaining their views of how the <u>Hayward</u> en banc decision applies to the facts presented in Petitioner's challenge to BPH's decision denying him parole. Doc. #12. Respondent filed supplemental briefing on June 3, 2010. Doc. #13. Petitioner failed to file supplemental briefing within the Court's scheduling order.

Having considered the entire record before the Court and all of the papers filed by the parties, the Court GRANTS the Petition and remands the matter to the Board to set a parole date for Petitioner within thirty (30) days from the date of this Order. See <u>Pirtle v. California Board of Prison Terms</u>, No. 07-16097, 2010 WL 2732888 at *8 (9th Cir. July 12, 2010).

## BACKGROUND

A.   The Commitment Offense and Procedural History of Petitioner's Challenges to His July 25, 2006 Denial of Parole.

With no objection from Petitioner, BPH incorporated by reference the two factual summaries of Petitioner's commitment offense as set forth in BPH's 2004 report, as follows:

> <u>Summary of Crime:</u>
>
> On May 27, 1985, there was a gang-related attack involving members of the Santa Anita gang against members of the Middlestone gang. This was apparently a pre-planned retaliation occurring at the local Strawberry Festival in Garden Grove. Members of the Middlestone gang, Victor Rodriguez, Faustino Bahena and Ray Ramirez, the victim, were cruising in Rodriguez's 1967 white Chevrolet. While waiting for the light to turn, a white, older model pickup truck pulled up adjacent to the right side of Rodriguez's

vehicle. Several Mexican male subjects including Leonard Frogs, Mike Ojeda and [Petitioner] jumped out of the pickup, began hitting Rodriguez's car, pulled victim Ray Ramirez out of the car and stabbed the victim with a knife. Hospital personnel advised the investigating officer that the victim died as a result of his many stab wounds. After the investigation on August 14, 1985, a palm print and bloody fingerprint were found on the suspect vehicle [and] were matched to those of [Petitioner], who was in custody on another matter. . . .

Prisoner's Version:

[Petitioner] admitted that the incident was gang-related, however, it was not pre-planned. It was a spur of the movement [sic] happening. [Petitioner] and other members of the Santa Anita gang were cruising when they saw two cars with members of the Middlestone gang. [Petitioner] stated it was common practice for two rival gangs who ran into each other to start to fight. There was the thought that their neighborhood needed defending. When the two gangs saw each other, they started fighting, and it got out of hand. [Petitioner] said that the gang didn't really mean to kill anyone but that Mike Ojeda got carried away and stabbed the victim, Ray Ramirez, who eventually died. It was [Petitioner's] opinion that Mike, who wasn't from the neighborhood, felt he had to prove himself in the neighborhood with the older "homeboys." That night, however, [Petitioner] had no say in what happened. [Petitioner] stated he pled guilty to Accessory to Murder because he was not going to give up any names, several of the gang members at the scene were only 12-14 years old. [Petitioner] realizes that even though he did not stab the victim, he was responsible for the victim's death. He wishes it had not happened. [Petitioner] had known the victim, had gone to school with the victim and would have never killed the victim. [Petitioner] stated he realizes now how violence hurts, not only the victim's family but his family also. It bothers him that the victim left behind a girlfriend and a daughter. [Petitioner] stated he is not involved in the gang life anymore. The most important people in his life are his wife and son. He claims to have made it clear to his "homeboys" he has met in prison, that he doesn't want anything to do with gangs. According to [Petitioner], his "homeboys" don't like his decision but they respect his decision.

3

Doc. #9-4 at 29; Doc. #9-6 at 7–8.

On February 4, 1986, eighteen year-old Petitioner pled guilty to second degree murder in Orange County superior court and was sentenced to an indeterminate term of fifteen years-to-life in state prison.

On July 25, 2006, thirty-eight year-old Petitioner appeared before BPH for his eighth parole consideration hearing. BPH again found him not suitable for parole and denied him a subsequent hearing for two years.

Petitioner challenged BPH's decision in the state superior, appellate and supreme courts. Doc. #9-4 at 2–9; Doc. #9-9 at 2; Doc. #9-11 at 2. After the Supreme Court of California summarily denied his petition for review on May 1, 2008, Petitioner filed the instant federal Petition for a Writ of Habeas Corpus. Doc. #1.

B.   The July 25, 2006 Parole Suitability Hearing

Regarding the commitment offense, BPH asked Petitioner "what happened that made you end up in jail for stabbing this guy if you didn't do it?" Doc. #9-4 at 31. Petitioner responded, "Well, I was there. I participated in everything that happened even though I was [not] the one who actually stabbed him, I did participate. You know, so I'm just as guilty as the guy who did it[] . . ." Id. Later in the hearing, Petitioner returned to the subject of his remorse for what he had done and his realization of the tragic pointlessness of his actions:

> [the rival gang members] were in their car. And they start yelling out their neighborhood and throwing up gang signs, and everybody started yelling out neighborhood[s], throwing up gang signs, and . . . basically words were exchanged. I know it's stupid, but everybody thought they had to defend the neighborhood at that time.
>
> . . . .
>
> They thought they were challenged, so everybody's chest kind of [got] pumped out and –

4

>you know, it was stupid. I know it was stupid. Back then I did not think it was stupid. Back then, it was – you know, part of what we did.
>
>. . . .
>
>And now that I realize it, I realize how stupid it was.

Id. at 35–36.

Petitioner's present attitude towards the crime and his feelings of remorse were substantiated by his most recent psychological evaluation, parts of which BPH read into the record at Petitioner's parole suitability hearing. See Doc. #9-5 at 33–35. According to the evaluating psychologist:

>[Petitioner] described the circumstances surrounding his commitment offense. He continues to admit and take full responsibility for the death of the victim. He notes that the incident involved gang retaliation, and the victim was stabbed by his crime partner. He states that he acted very immaturely and had been overly influenced by the wrong crowd. The inmate states that he was immaturely impressed by the wrong values at that time in his life, and he now understands that the family he had was much more important than the gang life that he was living.
>
>[Petitioner] added that the family he has now needs him as much as he needed his family at that point in his life. [Petitioner] also understands that his actions along with the actions of his crime partner caused the victim's family to change forever, wherein they will never be able to see the victim again.
>
>[Petitioner] demonstrates good insight into the commitment offense, psychologically, psychosocially, and intellectually.

Doc. #1-1 at 74–75.

Under the "Assessment of Dangerousness" heading, the psychologist concluded:

>[Petitioner's] violence potential within a controlled setting is considered to be significantly lower than

5

> this level II inmate population. This is based on several factors. On one hand, [Petitioner] had a juvenile criminal record and previous gang affiliation. [Petitioner] also received, during his entire 20-year incarceration period, two [serious rules violations] and five [disciplinary infractions]. On the other hand, [Petitioner] has not received a disciplinary in 16 years, and has never received a disciplinary for any violent behavior during his 20 years of incarceration with the California Department of Corrections. [Petitioner] denies any gang affiliation within the California Department of Corrections. Incarcerated at the age of 17, he appears to have greatly matured, both as a result of his long stay, and from insight gained from his participation in multiple self-help groups. Therefore, in light of these factors, his violence potential is considered to be significantly below the average relative to this inmate II population.
>
> If released to the community, his violence potential is estimated to be no higher than the average citizen in the community. This takes into consideration his: 1) greater maturity and age; 2) Ability to deal with stressful and often violent situations and continue to remain violence-free.
>
> There are no significant current risk factors for [Petitioner] which could be [a] precursor to violence . . .

Id. at 75.

In his report, the psychologist also noted "[n]o records for [Petitioner] include any mention of problems with alcohol or drugs." Doc. #1-1 at 73. The psychologist continued: "[t]o his credit, for self-help reasons, [Petitioner] has attended Narcotics Anonymous [("NA")] from 1993 until 1998, and has started and continues to attend this program currently. This inmate does not appear to have a substance abuse problem." Id.

When asked to explain why he attended NA despite his lack of substance abuse history, and why he had not worked any of the twelve steps, Petitioner explained: "[w]hat I do when I go to NA, is I listen to what these guys are talking

about, and I'll get up there and I'll talk to them about some of the stuff that my father went through when he was drinking and stuff like that." Doc. #9-5 at 29. BPH challenged Petitioner's motives, asking:

> given that background, it would seem to me that you would be all the more anxious to get in and participate and actually learn something about NA, . . . and I'm asking you that question because I'm looking at about seven or eight laudatories for your NA participation. So that certainly diminishes that somewhat.

Id. at 29–30. Petitioner explained: "when you get up there, and you speak in front of everybody there, you're participating with NA, and I'm sharing some of my life experience with these guys, and I'm participating in that way." Id. at 30. BPH interrupted Petitioner, stating, "I commend you for sharing, but you've got to receive something. That's the intent." Id. Petitioner responded: "I do receive something. . . . Every time somebody comes up there and they tell you what they've been through and the losses that they've had behind alcohol or drugs, I get a lot out of that. . . ." Id.

      BPH proceeded to note that since his last parole suitability hearing, Petitioner earned eight laudatory chronos for participation in various self-help programs, including NA and anger management. Doc. #9-5 at 31–32. BPH read portions of some of the chronos; one, dated July 10, 2006, was written by a correctional officer who noted Petitioner's "judgment, character, how [he] cooperate[s] and work[s] with staff. They talk about [his] level of maturity." Doc. #9-5 at 30. Another officer wrote about Petitioner's "unique behavior and attitudes towards [his] supervisors and fellow inmates. [His] assuring demeanor and . . . willingness to help others, [his] efforts to work and ensure the smooth operation of [the] busy work area." Id. at 30–31.

      In discussing Petitioner's parole plans, BPH acknowledged that he would

7

live with his wife and son in Anaheim and had a firm offer of employment in construction as well as the opportunity to participate in a paid plumbing apprenticeship. Doc. #9-5 at 36–38. BPH also noted that Petitioner's prison job assignment as a cart-pusher in a restricted area demonstrated that prison staff had "confidence" in Petitioner and that he held a "position of a certain amount of trust." Id. at 26–27.

At the conclusion of the evidentiary portion of the hearing, BPH rendered its decision, and found that Petitioner was "not suitable for parole and would pose and unreasonable risk of danger to society or a threat to public safety if released from prison." Doc. #9-5 at 55. In denying Petitioner parole, BPH relied heavily on the circumstances of the commitment offense, finding it "especially cruel and callous" and "dispassionate and calculated." Id.; see also Doc. #9-6 at 2. BPH also found that Petitioner had an "escalating pattern of criminal conduct and violence" and that he "failed previous grants of probation and cannot be counted upon to avoid criminality." Doc. #9-5 at 56. BPH noted that Petitioner "failed to profit from society's previous attempts to correct his criminality, such as juvenile probation and [imprisonment in the California Youth Authority]. Id. BPH also found that Petitioner had "programmed in a limited manner while incarcerated, has failed to upgrade educationally. Id.

C. The State Court Decision Regarding Petitioner's Challenge to BPH's July 26, 2006 Denial of Parole

The state superior court affirmed the decision of BPH to deny Petitioner parole. Doc. #9-2 at 3. The court found that BPH's decision was "supported by some evidence in the record" and noted that BPH "reasonably relied upon the circumstances of the commitment offense. (Pen. Code § 3041(b); Cal. Code Regs., tit. 15, § 2402(b) and (c)(1)(B)(D)(E).)" Id. The court also found that

there was "some evidence" to support BPH's findings that Petitioner had an escalating pattern of criminal conduct and a record of institutional misconduct. Id. at 4. But the court disagreed that there was "some evidence" to support BPH's finding that Petitioner had programmed in a limited manner and failed to upgrade academically. Id.

## LEGAL STANDARD

In <u>Hayward</u>, the Ninth Circuit explained the law in California as it relates to parole suitability determinations:

> The California parole statute provides that the Board of Prison Terms "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." The crucial determinant of whether the prisoner gets parole in California is "consideration of the public safety."
>
> In California, when a prisoner receives an indeterminate sentence of fifteen years to life, the "indeterminate sentence is in legal effect a sentence for the maximum term, subject only to the ameliorative power of the [parole authority] to set a lesser term." Under the California parole scheme, the prisoner has a right to a parole hearing and various procedural guarantees and rights before, at, and after the hearing; a right to subsequent hearings at set intervals if the Board of Prison Terms turns him down for parole; and a right to a written explanation if the Governor exercises his authority to overturn the Board of Prison Terms' recommendation for parole. Under California law, denial of parole must be supported by "some evidence," but review of the [decision to deny parole] is "extremely deferential."

<u>Hayward</u>, 603 F.3d at 561–62 (footnotes and citations omitted).

The court further explained,

> Subsequent to Hayward's denial of parole, and subsequent to our oral argument in this case, the California Supreme Court established in two

9

> decisions, In re Lawrence . . . and In re Shaputis, . . . that as a matter of state law, "some evidence" of future dangerousness is indeed a state sine qua non for denial of parole in California. We delayed our decision in this case so that we could study those decisions and the supplemental briefs by counsel addressing them. As a matter of California law, "the paramount consideration for both the Board [of Prison Terms] and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety." . . . There must be "some evidence" of such a threat, and an aggravated offense "does not, in every case, provide evidence that the inmate is a current threat to public safety." . . . The prisoner's aggravated offense does not establish current dangerousness "unless the record also establishes that something in the prisoner's pre- or post-incarceration history, or his or her current demeanor and mental state" supports the inference of dangerousness. . . . Thus, in California, the offense of conviction may be considered, but the consideration must address the determining factor, "a current threat to public safety."

Hayward, 603 F.3d at 562 (footnotes and citations omitted).

After providing this background on California law as it applies to parole suitability determinations, the court then explained the role of a federal district court charged with reviewing the decision of either BPH or the governor denying a prisoner parole. According to the Ninth Circuit, this Court must decide whether a decision "rejecting parole was an 'unreasonable application' of the California 'some evidence' requirement, or was 'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 562–63 (citations omitted); see also Cooke v. Solis, 606 F.3d 1206, 1208, n. 2 & 1213 (9th Cir. 2010) (applying Hayward and explicitly rejecting the state's argument that "the constraints imposed by [the Antiterrorism and Effective Death Penalty Act ("AEDPA")] preclude federal habeas relief" on petitioner's claim; noting that in Hayward, the court "held that due process challenges to California courts' application of the 'some evidence' requirement are cognizable on federal habeas

10

review under AEDPA").

## DISCUSSION

A.     California Law Regarding Parole Suitability Determinations

When assessing whether California parole board's suitability determination was supported by "some evidence," the Court's analysis is framed by the "regulatory, statutory and constitutional provisions that govern parole decisions in California." Cooke, 606 F.3d at 1213 (citing In re Rosenkrantz, 29 Cal. 4th 616 (2002)); see Hayward, 603 F.3d at 561–62. Under California law, prisoners serving indeterminate life sentences, like Petitioner, become eligible for parole after serving minimum terms of confinement required by statute. In re Dannenberg, 34 Cal. 4th 1061, 1069–70 (2005). Regardless of the length of the time served, "a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." Cal. Code Regs. tit. 15, § 2402(a). In making this determination, BPH must consider various factors, including the prisoner's social history, past and present mental state, past criminal history, the base and other commitment offenses, including behavior before, during and after the crime, past and present attitude toward the crime and any other information that bears on the prisoner's suitability for release. See Cal. Code Regs. tit. 15, § 2402(b)–(d).

In considering the commitment offense, BPH must determine whether "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." Cal. Code Regs. tit. 15, § 2402(c)(1). The factors to be considered in making that determination include: "(A) Multiple victims were attacked, injured or killed in the same or separate incidents; (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder; (C) The

victim was abused, defiled or mutilated during or after the offense; (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering; (E) The motive for the crime is inexplicable or very trivial in relation to the offense." Id.

As the Ninth Circuit observed in Hayward, the California Supreme Court has held that, "the core statutory determination entrusted to the Board and the Governor [in determining a prisoner's parole suitability] is whether the inmate poses a current threat to public safety . . . ." In re Lawrence, 44 Cal. 4th 1181, 1191 (2008). And, "the core determination of 'public safety' under the statute and corresponding regulations involves an assessment of an inmate's current dangerousness." Id. at 1205 (emphasis in original) (citing Rosenkrantz, 29 Cal. 4th 616 and Dannenberg, 34 Cal. 4th 1061). The court further explained that:

> a parole release decision authorizes the Board (and the Governor) to identify and weigh only the factors relevant to predicting "whether the inmate will be able to live in society without committing additional antisocial acts." . . . These factors are designed to guide an assessment of the inmate's threat to society, if released, and hence could not logically relate to anything but the threat currently posed by the inmate.

Lawrence, 44 Cal. 4th at 1205–06 (citations omitted). The relevant inquiry, therefore, is:

> whether the circumstances of the commitment offense, when considered in light of other facts in the record, are such that they continue to be predictive of current dangerousness many years after commission of the offense. This inquiry is, by necessity and by statutory mandate, an individualized one, and cannot be undertaken simply by examining the circumstances of the crime in isolation, without consideration of the passage of time or the attendant changes in the inmate's psychological or mental attitude.

In re Shaputis, 44 Cal. 4th 1241, 1254–55 (2008).

The evidence of current dangerousness "must have some indicia of

12

reliability." In re Scott, 119 Cal. App. 4th 871, 899 (2004) (Scott I). Indeed, "the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact." In re Scott, 133 Cal. App. 4th 573, 590, n. 6 (2005) (Scott II).

Subsequent to Hayward, the Ninth Circuit issued decisions in Cooke, 606 F.3d 1206, and Pirtle, 2010 WL 2732888, both of which focused on the notion that the "some evidence" of current dangerous must be reliable. In Cooke, the court ultimately reversed the district court's denial of Cooke's challenge to BPH's decision denying him parole, finding that BPH's stated reasons for denying parole did not support the conclusion that Cooke posed a current threat to public safety. Cooke, 606 F.3d at 1216. Specifically, the court stated:

> [E]ach of the Board's findings . . . lacked any evidentiary basis. Nothing in the record supports the state court's finding that there was "some evidence" in addition to the circumstances of the commitment offense to support the Board's denial of Petitioner's parole. The Parole Board's findings were individually and in toto unreasonable because they were without evidentiary support. When habeas courts review the "some evidence" requirement in California parole cases, both the subsidiary findings and the ultimate finding of some evidence constitute factual findings. Here, there was no evidence that reasonably supports either the necessary subsidiary findings or the ultimate "some evidence" finding. Accordingly, we hold that the state court decision was "'based on an unreasonable determination of the facts in light of the evidence.'" Hayward, 603 F.3d at 563 (quoting 28 U.S.C. § 2254(d)(2)). Cooke is entitled to a writ of habeas corpus.

Id.; see also Pirtle, 2010 WL 2732888 at *8 (affirming the district court's decision to grant habeas relief, concluding, "In sum, there is no evidence in the record to support the Board's finding that Pirtle poses a current threat to public safety. The Board's stated reasons for the denial of parole either lacked evidentiary support, had no rational relationship to Pirtle's current

13

dangerousness, or both.")

B. <u>Analysis of Petitioner's Claim</u>

Unlike the state appellate and supreme courts, which issued summary denials of relief, <u>see</u> Doc. # 9-9 at 2; Doc #9-11 at 2, in its decision denying Petitioner relief, the state superior court provided not just a legal conclusion, but analysis as well. It is that decision, therefore, that the Court analyzes under AEDPA. <u>See</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.7 (9th Cir. 2000); <u>Williams v. Rhoades</u>, 354 F.3d 1101, 1106 (federal court may look to any lower state court decision that was examined, and whose reasoning was adopted, by the highest state court to address the merits of a petitioner's claim). As explained below, after careful review of the record, the Court finds that the state court's approval of BPH's decision to deny Petitioner parole was an unreasonable application of the California "some evidence" standard, and was based on an unreasonable determination of the facts in light of the evidence presented in the state courts. <u>See</u> <u>Hayward</u>, 603 F.3d at 562–63.

Although BPH relied heavily on the circumstances surrounding the commitment offense, it noted other reasons for a finding of unsuitability: Petitioner's escalating pattern of criminal conduct as a juvenile and record of institutional misconduct – which the court acknowledged "took place 17 years ago." Doc. #9-2 at 3–5. But the court disagreed that there was "some evidence" to support BPH's finding that Petitioner had programmed in a limited manner and failed to upgrade academically. Id.

After careful review of the law and the factual record now before the Court, it is difficult, if not impossible, to reconcile BPH's decision to deny Petitioner parole with the evidence upon which it relied to make that decision. Regarding BPH's reliance on Petitioner's escalating pattern of criminal conduct

14

|   |   |
|---|---|
| 1 | as a juvenile – the evidence shows that beginning at around age 14 and up until |
| 2 | age 17, when he was arrested for the commitment offense, Petitioner was arrested |
| 3 | for crimes including burglary, possession of a combat knife, violation of a court |
| 4 | order and vandalism.  Doc. #9-5 at 9–12.  But BPH examined this "escalating |
| 5 | pattern of criminal conduct as a juvenile" in isolation, focusing only on |
| 6 | Petitioner's three years of criminality as a teenager, giving short-shrift to |
| 7 | Petitioner's unblemished disciplinary history in prison for the last sixteen years |
| 8 | and ignoring that <u>none</u> of Petitioner's disciplinaries involved force or violence. |
| 9 | BPH, therefore, ignored the "the paramount consideration" under California law |
| 10 | in determining a prisoner's parole suitability – whether the inmate <u>currently</u> |
| 11 | poses a threat to public safety.  Even the examining psychologist concluded that |
| 12 | Petitioner did not pose a current risk of danger to society if released on parole. |
| 13 | There simply was no reliable evidence to suggest that if released on parole, |
| 14 | Petitioner would pose an unreasonable and current risk of danger to society or |
| 15 | threat to public safety if released from prison.  <u>See</u> <u>Hayward</u>, 603 F.3d at 561–62; |
| 16 | <u>Lawrence</u>, 44 Cal. 4th at 1191, 1205–06; Cal. Code Regs. tit. 15, § 2402(a).  As a |
| 17 | result, petitioner is entitled to federal habeas relief.  <u>See</u> <u>Cooke</u>, 606 F.3d at 1216; |
| 18 | <u>Pirtle</u>, 2010 WL 2732888 at *8 ("[t]he record contains no evidence that |
| 19 | contradicts [the] professional assessment [of the psychologist who concluded the |
| 20 | petitioner] was neither unstable [n]or potentially dangerous"). |
| 21 | // |
| 22 | // |
| 23 | // |
| 24 | // |
| 25 | // |
| 26 | // |
| 27 |   |
| 28 | 15 |

**CONCLUSION**

For the reasons set forth above, the Petition for a Writ of Habeas Corpus is GRANTED. Within thirty (30) days from the date of this order, BPH must set a parole date for Petitioner. See Pirtle, 2010 WL 2732888 at *8. Within ten (10) days of Petitioner's release, Respondent must file a notice with the Court confirming the date on which Petitioner was paroled.

The clerk shall enter judgment in favor of Petitioner and close the file.

SO ORDERED.

DATED: August 30, 2010

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.08\Cardona-08-5429.bph grant-post hayward.wpd        16